JOSHUA I. CAMPBELL
Jardine, Stephenson, Blewett & Weaver, P.C.
300 Central Avenue, Suite 700
P.O. Box 2269
Great Falls, MT  59403-2269
(406) 727-5000
(406) 761-4273 (Fax)
jcampbell@jardinelaw.com

FRED KELLY GRANT (*pro hac vice* application to be filed)
Fred Kelly Grant Ltd.
249 Smith Avenue
Nampa, ID  83651
(208) 949-1061
(406) 761-4273 (Fax)
fkellygrant@gmail.com

*Attorneys for Defendants George Kornec, Philip Nappo, and
Intermountain Mining and Refining, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## HELENA DIVISION

| UNITED STATES OF AMERICA, | Cause No. CV-15-78-H-CCL |
|---|---|
| Plaintiff, | |
| v. | **FIRST AMENDED ANSWER TO COMPLAINT, COUNTERCLAIM FOR DECLARATORY JUDGMENT AND PERMANENT INJUNCTIVE RELIEF, AND DEMAND FOR JURY TRIAL PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 57 AND 58** |
| GEORGE KORNEC, PHILIP NAPPO, INTERMOUNTAIN MINING AND REFINING, LLC, | |
| Defendants. | |

Come Now Defendants and Counterclaim Plaintiffs George Kornec, Philip Nappo ("Nappo"), and Intermountain Mining and Refining, LLC ("Intermountain" or "Intermountain Mining")(collectively "Defendants" or "Counterclaim Plaintiffs") and admit, deny, and allege as follows:

## ANSWER

### First Defense

The Complaint fails to state a claim for relief against these Defendants upon which relief can be granted.

### Second Defense

1.      Answering paragraphs 1 and 2, Defendants admit these allegations.

2.      Answering paragraph 3, Defendants admit that Intermountain Mining is a Montana limited liability company, but deny it is a corporation.  Defendants admit the remaining allegations in this paragraph.

3.      Answering paragraphs 4 through 6, the allegations contained therein state legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny them accordingly.

4.      Answering paragraph 7, Defendants admit that they own or have an interest in unpatented mining claims known as the White Hope, Sammy K, and Silver Dollar mining claims (collectively "White Hope"), located in the Helena

National Forest near Lincoln, Montana.  Defendants admit they believe they have a right to explore and develop minerals pursuant to the correctly applicable laws and regulations of the United States.  The remaining allegations in paragraph 7 state legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny them accordingly.

5.      Answering paragraphs 8 through 10, the allegations contained therein state legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny them accordingly.

6.      Answering paragraph 11, Defendants admit that they received a notice dated August 19, 2014, from the United States Department of Agriculture Forest Service ("Forest Service").  The notice speaks for itself.  Defendants deny they were in non-compliance.

7.      Answering paragraph 12, the notice referenced therein speaks for itself.  Defendants deny they were in non-compliance.  Defendants admit they participated in an in-person meeting with William Avey and others.  Defendants admit William Avey issued a letter dated December 3, 2014.  Said letter speaks for itself.

8.      Answering paragraph 13, Defendants deny the Forest Service sought to work with or worked with Defendants but rather gave Defendants orders.

3

Paragraph 13 also contains allegations that are legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny them accordingly.

9.     Answering paragraph 14, Defendants admit they filled out and submitted a document to the Forest Service on a preprinted Forest Service form titled Plan of Operations for Mining Activities on National Forest System Lands on or about February 9, 2015 ("Plan of Operation").

10.     Answering paragraph 15, Defendants admit that a meeting was held on June 18, 2015, at the White Hope mine site with Forest Service personnel and Defendants.  Defendants admit they discussed the Plan of Operation with the Forest Service.  Defendants deny the remaining factual allegations.  Paragraph 15 also contains allegations that are legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny them accordingly.

11.     Answering paragraph 16, Defendants admit that a meeting was held on July 30, 2015, at the Lincoln District Ranger Station with Forest Service personnel and Defendants.  Defendants admit they discussed the Plan of Operation with the Forest Service.  Defendants admit they agreed to fill out and submit a new preprinted Forest Service form titled Plan of Operations for Mining Activities on

4

National Forest System Lands.  Defendants admit they agreed to remove explosives currently stored on or near the White Hope mine site.  Defendants did not complete submission of this new document, at that time, as a result of Forest Service's subsequent and bad faith actions.  Defendants did not remove explosives due to subsequent conversations with local law enforcement and the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATFE"), who advised and requested Defendants not to remove the explosives.

12.     Answering paragraph 17, Defendants admit they sought assistance from others for protection after the Forest Service acted in bad faith in a bait and switch operation (as further described hereafter).  Defendants deny they requested armed individuals to come to the White Hope mine site.  Defendants are without information sufficient to form a belief as to the truth of the allegations regarding what the Oath Keepers or other related groups said or represented.  Defendants admit they submitted a letter dated August 3, 2015, to the Forest Service.  This letter speaks for itself.  Paragraph 17 also contains allegations that are legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny them accordingly.

13.     Answering paragraph 18, the allegations contained therein state legal conclusions to which no response is required.  To the extent that a response is

required, Defendants deny them accordingly.  Defendants deny the remaining factual allegations.

14.     Answering paragraph 19, Defendants are without information sufficient to form a belief as to the truth of the allegations contained therein regarding complaints received by the Lincoln Ranger District from members of the public.  Paragraph 19 also contains allegations that are legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny them accordingly.  Defendants deny the remaining factual allegations.

15.     Answering paragraph 20, Defendants admit that a double lock system gate exists at the mine site in question for which the Forest Service has a key. Defendants admit that several signs have been installed near the gate including several signs installed by the Forest Service.  Defendants admit the gate is currently in its normal, closed, locked condition for which the Forest Service has a key. Defendants admit a no trespassing sign is currently posted.  Paragraph 20 also contains allegations that are legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny them accordingly. Defendants deny the remaining factual allegations.

16.     Answering paragraph 21, Defendants admit they are aware the State of Montana is conducting a mine reclamation project near the old Mike Horse mine

tailings pond.  Defendants admit they are aware the Montana Department of Environmental Quality ("DEQ") is overseeing this reclamation project.  The document titled Emergency Road Closure Order dated April 30, 2015, speaks for itself.  Defendants admit that the Forest Service issued a document titled Permit for Use of Roads, Trails, or Areas Restricted by Regulation or Order dated June 18, 2015, to Nappo.  This document speaks for itself.  Paragraph 21 also contains allegations that are legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny them accordingly.  Defendants are also without knowledge sufficient to form a belief as to the truth of the allegations contained therein that relate to the DEQ's activities, any contractor hired by the DEQ, the specific roads referenced, and the Oath Keepers' activities, and, therefore, deny the same.

17.    Answering paragraph 22, the allegations contained therein state legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny them accordingly.  Defendants deny the remaining factual allegations.

18.    Defendants deny each and every allegation contained in the Complaint not specifically admitted herein.

### Third Defense

Plaintiff's claims are barred by the doctrines of estoppels, waiver, and laches.

### Fourth Defense

Plaintiff's claims are barred by the doctrine of *in pari delicto*.

### Fifth Defense

Plaintiff's claims are barred by the doctrine of unclean hands.

### Sixth Defense

Plaintiff's claims are barred as Plaintiff is seeking to circumvent the authority, oversight, and duties of another government agency.  By way of example, the Forest Service does not have authority or oversight over explosives.

### Seventh Defense

Plaintiff's claims are barred inasmuch as the Court lacks subject-matter jurisdiction.  By way of example, the Forest Service does not have authority or oversight over explosives.

### Eighth Defense

Plaintiff's damages, if any, were caused in whole or in part by their own negligence or actions, and, therefore, any recovery by Plaintiff must be diminished as provided by law.

### Ninth Defense

Plaintiff has failed to mitigate its damages.

### Tenth Defense

Plaintiff has failed to join a party under Rule 19 of the Federal Rules of Civil

Procedure.

### COUNTERCLAIMS

### Introduction

1.      This complaint is filed as a counterclaim to a lawsuit filed by the United

States of America on behalf of the United States Department of Agriculture, Forest

Service (hereinafter the "Forest Service") against George Kornec (hereinafter

"Kornec"), Philip Nappo (hereinafter "Nappo"), and Intermountain Mining and

Refining, LLC (hereinafter "Intermountain").   It seeks relief under the Federal

Declaratory Judgment Act, 5 U.S.C. §§ 2201-2202, in the form of a Judgment

declaring the property rights of Kornec, Nappo and Intermountain in certain mining

claims filed and based upon the Mining Laws of the United States, 30 U.S.C. Chapter

2, the Fifth and Fourteenth Amendments to the United States Constitution, and

Article II, Sections 3, 4, 10, and 17 of the Montana State Constitution.  It also seeks

injunctive relief against the Forest Service to prevent further interference with and

damage to the property rights so declared herein.

2.      The claims in the form of this counterclaim are brought because of the continued harassment of Kornec and Nappo as they carry on their lawful activities working their mining claims which are their vested private property interests, damage to the mining equipment and facilities related to said mining claims, threats to destroy the facilities necessary to the lawful operation of their mining claims, blocking access to said mining claims, and bringing actions to try to terminate their right to work their mining claims which constitute their private property.

3.      Declaratory Judgment and Injunctive Relief pursuant to that Judgment are appropriate in this case because they are not requested prematurely but in response to and parallel to the Forest Service's attempt to terminate, destroy, and take the property rights of Kornec, Nappo, and Intermountain.

## The Parties

4.      Plaintiff and Counterclaim-Defendant is the United States of America on behalf of the United States Department of Agriculture, Forest Service (identified specifically for this section, but hereafter known as the "Forest Service").

5.      Defendants   and   Counterclaim-Plaintiffs   are   George   Kornec (hereinafter "Kornec") and Philip Nappo (hereinafter "Nappo") who reside in the federal District of Montana, and own the property interest in mining claims located

within the Helena National Forest and claimed prior to the establishment of said National Forest.

6.      Defendant and Counterclaim-Plaintiff Intermountain Mining and Refining, LLC (identified specifically for this section, but hereafter known as "Intermountain") is a Montana limited liability company managed by its members, in good standing in Montana, with its principal office in Great Falls, Montana.

## Jurisdiction and Venue

7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (civil action arising under the laws of the United States), 30 U.S.C. §§ 28 and 29 (the Mining Laws of the United States creating the rights of miners who locate mineral deposits), 28 U.S.C. §§ 2201 and 2202 (providing the right to declaratory judgment including injunctive relief), and 28 U.S.C. § 1345 (the Plaintiff is the United States of America).

8.      Venue is proper under 28 U.S.C. § 1391(b) in the State of Montana because Kornec and Nappo are residents of the State of Montana and Intermountain is a business entity that maintains its principal place of business in the State of Montana.  The acts and omissions to act substantially occur within the State of Montana and do involve property rights and property located in the State of Montana.

9.    A justiciable controversy exists between Plaintiff-Counterclaim Defendant and the Defendants-Counterclaim Plaintiffs, and the relief requested by Kornec, Nappo, and Intermountain is appropriate and proper under 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the United States and Montana Constitutions.

### General Allegations

10.    Kornec and Nappo have valid and lawful mining claims in the State of Montana that were staked in 1924 as the Heddleston Mining District, and were filed on April 10, 1924, by Walt and Sam Kornec when they homesteaded the property on which the claims are located.  Historians write and document that at this time the claims for land and for mineral interests were often crossed over, with claims being recognized by the United States on lands already withdrawn for National Forests or other designations.   It was during this time that the Kornecs homesteaded the land on which the mining claims are located; in fact, it was the mining potential that led the Kornecs to select this land and homestead it.  What they did was what Congress intended with passage of the Mining Laws of 1866, 1870, 1872 and Revised Statute 2477.   The latter simply provided:  "The right-of-way for the construction of highways over public lands, not reserved for public

uses, is hereby granted", and was passed, in part, so that miners could get to the mineral source and water, and grazers could get to water.

11.    Walt, Euler, George, Bill, Ray, Rose, and Willy Kornec formed a corporation and set up mining to work the claims as a corporation.  They were relatives of Kornec the Defendant-Counterclaim Plaintiff.

12.    When Kornec was ready to go into the mining business, he purchased the shares of the corporation his relatives had set up and went into business with his brother.

13.    Kornec and Nappo had worked a prior mining operation together, and had been best friends for a long period of time when Kornec brought him into ownership as a partner of the claims and mines.  Intermountain was formed in 2007 and Kornec and Nappo are the only members of Intermountain.

14.    The Claims for which they seek Declaratory Judgment and Injunctive relief are identified as the White Hope, Sammy K and Silver Dollar claims (hereinafter "the claims" or "the mining claims")(T15N, R6W, Sections 27 and 34, MPM).

15.    These unpatented mining claims are recorded with Lewis and Clark County in the State of Montana and the State of Montana has issued a certificate of location.

16.     Kornec and Nappo pay a claim fee for the claims, referred to hereinabove, and for all mining claims which are their property, each year to the federal Bureau of Land Management (hereinafter "BLM").  These fees are all paid up current.

17.     Kornec and Nappo pay taxes on the facilities for working the claims and the claims to the County of Lewis and Clark, State of Montana and are paid up current with taxes.

**Factual Allegations Giving Rise to the Counterclaims**

18.     Kornec and Nappo had been friends for years before Intermountain was formed.  They began discussing business together in or about the year 2005, and Intermountain was established and filed with the Montana Secretary of State as a limited liability company in 2007.

19.     Interference with business operations parallel the initiation and progress of the Mike Horse Reclamation or Cleanup Project, the site of which is adjacent to the land on which Kornec's and Nappo's mines and mining claims are located.

20.     According to the website of the Montana Department of Justice:  "In 1983 the State of Montana filed suit against the Atlantic Richfield Co. (ARCO) for injuries to the natural resources in the Upper Clark Fork River Basin. The lawsuit,

brought under federal and state Superfund laws, sought damages from ARCO, contending that decades of mining and smelting in the Butte and Anaconda areas had greatly harmed natural resources in the basin and deprived Montanans of their use."  The lawsuit included the Mike Horse Dam which was identified as in being in danger of rupture (this lawsuit is hereinafter referred to as the "Mike Horse Lawsuit")

21.    In 1985, two years into the Mike Horse Lawsuit, Kornec experienced his first episode of trouble with BLM which is the oversight agency over mineral mining claims.  Kornec's annual "Application of Annual Representation of Mining Claim" was due to be filed on December 30, 1985.    To comply with these requirements Kornec wrote out his report, and completed filling in the Application prior to December 30.    On December 30, 1985, he went to the office of Clerk Recorder of Lewis and Clark County, Montana, had the affidavit notarized and filed it of record.  The document is attached to the Complaint filed in this case.  It clearly shows that it was executed on December 30, 2015, at 9 minutes past twelve noon.

22.    Kornec walked the executed, recorded document around the corner in the same building from the Clerk and Recorder's office to the United States Post Office and left it in an envelope to be mailed by certified mail.  He completed all

the actions needed by him to get the document to BLM with a postmark prior to December 31, 1985.

23.    BLM had established a regulation that the affidavit must be postmarked prior to December 31, even though the specific affidavit in this case was intended to demonstrate continued work on the mining claims for the year 1985.  There is no rational basis for requiring a postmark prior to the last day of the year, particularly when the second half of the regulation states that the affidavit must be received prior to January 19 of the following year. The affidavit was actually received in the BLM office on January 2, but was postmarked December 31, one day late under the Code of Federal Regulation then in place, 43 CFR § 3833.2-1 which today applies only to National Parks lands and mining operations. The BLM regulation applied an arbitrary deadline not included in the Federal Land Policy and Management Act which was the source statute being applied at that time.

24.    The regulation should not even have been applied to Kornec because his claims vested under the Mining Laws of 1866, 1870, and 1872 as property rights and interests, not subject to revision or substantive restriction under any successor statutes.

25.     Kornec has no idea why the Post Office did not postmark the affidavit on December 30, the day he mailed it.  He has been told that the practice of the Post Office at that site at the time was that any mail dropped after twelve noon was not postmarked until the following business day.  If this is true, then the mail he left on December 30 at a few minutes past twelve noon would not have been postmarked until the next business day which was December 31, one day too late under the irrational cutoff date set by BLM.

26.     A notice of abandonment by reason of a one day late postmark was prepared, based on the 1985-1986 mailing, but was not served prior to the decision of abandonment.   Therefore, Kornec's right to due process of law attached to actions affecting his property rights and interests in his mining claims was violated.

27.     This set of circumstances constitutes a clear violation of due process of law.  The Constitution of the United States and scores of case decisions interpreting that Constitution provide that if a property right or interest is to be adversely impacted, the person holding that right or interest is entitled to be timely notified of  the proposed adverse action the government agency is considering, the impact to the recipient of the proposed action, what issues the recipient needs to address in order to avoid the action, when in timely fashion the recipient will be

scheduled to present his/her response to the issues and proposed adverse action, and what standard the agency will use to determine the issues.

28.    Kornec never received notice that the agency considered their mailing to be late because of the postmark, until he received a notice of abandonment. Had he received such notice, he could have replied and immediately shown why the postmark was placed on the mail a day after it was left for certified mail.

29.    Kornec never was given a timely date upon which he could appear and contest the agency's proposed decision.

30.    And Kornec was not timely given notice of the agency's conclusion based on its own version of the facts, without benefit of any response from him. His only notice came after the fact, after abandonment was said to have taken place by passage of a date alone.

31.    Such conduct regarding a property right or interest is unlawful and unconstitutional in that it deprived Kornec of that process due him under the Constitutions of the United States and Montana.

32.    From the early days of Kornec and Nappo forming their business, the Counterclaim Defendant Forest Service began harassing and interfering with Kornec and Nappo in the business of working their property claims.

33.     During one of the annual visits of the Forest Service to the Kornec and Nappo property a person was identified to Kornec and Nappo as an employee of the Forest Service named Dave Madden (hereinafter "Madden").   Madden was also identified by the Forest Service as a mineral examiner in training.  During one of such meetings, Madden drove the Forest Service truck he was operating over and crushed the end of a culvert necessary for the operation of the Kornec and Nappo mining operation.

34.     Kornec and Nappo had to repair the damage at their own expense and with their own time.

35.     As Madden demanded a certain cleanup process for the area, a level of tension developed between Madden and Nappo over Madden's attitude and lack of knowledge of mining operations which Madden was trying to oversee and micro-manage.  Madden visited the site without supervision even though he was represented to be an employee only in training.

36.     After the tense situation developed with Madden, Madden left and then later returned and made demands for operation changes uncalled for in the operation of Kornec and Nappo's mining interests.  Madden told Kornec and Nappo that if they did not do what he said, Madden would get together a crew to cut up their equipment and tear down the buildings necessary to the mining operations.

37.     Following this threat by Madden, Kornec visited the Lincoln Ranger District Office for the Forest Service and told the Ranger staff of Madden's conduct and threat.   A call was put into the District Office in Helena, and during the conference call, a voice on the District Office side of the call was heard by Kornec to say: "Madden really did not say that….did he?"   To Kornec's and Nappo's knowledge, nothing was done and no action was taken against Madden as a result of his threat to destroy equipment which was property of Kornec and Nappo.

38.     Madden's threats and the Forest Service's lack of action to remedy the situation created by Madden or to take oversight of Madden's demand that Kornec and Nappo produce a new plan of operation constitute examples of harassing and interfering with Kornec and Nappo in the business of working their property claims.

39.     Madden's demands were out of line with the law under which the mining claims had vested as property rights.  The demands he made were in line with authority of the Forest Service as though the Multiple Use Act of 1955 applied to them.  It did not.  The United States Supreme Court has made it quite clear that mining claims filed pursuant to 30 U.S.C. Chapter 2 constituted private property rights and interests which vested and could not be administered under any successor statute to the detriment of the property rights and interests that had vested.  During this period of time, Kornec and Nappo tried to cooperate with the

Forest Service by going along with their regulatory process based on the 1955 Act, but they did so voluntarily and not because they were obligated to do so.  Taking advantage of the spirit of cooperation with which Kornec and Nappo worked, the Forest Service continued and heightened its harassment and interference.

40.     By contrast, over the years, there were some employees/officials of the Forest Service such as Beth Ible (a mineral examiner) from the Townsend Ranger District who would visit the site from time to time and offer suggestions that were reasonable and non-interfering with productive use of the property by Kornec and Nappo, and the two owners of the claims followed them.  An example is Ible's suggestion that a French Drain be put in so that water runoff would drain directly into a culvert at the road crossing at White Hope #7 mine.  Kornec and Nappo followed her suggestion and installed the Drain.

41.     Kornec and Nappo did not object to suggestions made by Forest Service employees and officials which were made in the spirit of helping them manage and operate their property efficiently, but they did and do object to continuing demands and threats made by the Forest Service.

42.     Meanwhile, the Mike Horse Lawsuit had been settled and the Reclamation Clean Up Project was underway.  The base of the lawsuit filed and processed by the State was that toxic materials had accumulated in the waters and

would be contained in the tailings left when the dam was breached.  In 2013, a repository site was decided upon, some 8 miles from the site of the Reclamation. The Missoula daily newspaper in March 2011 reported that a group of neighbors to the repository were upset with the manner in which the then proposed repository had been purchased outside public scrutiny.   The paper reported a highly contentious meeting between state representatives, members of the Forest Service staff, and homeowners near the repository.

43.    In August 2014, Kornec and Nappo attended a meeting in the Lincoln Ranger Station in Lincoln, Montana, for discussion of the impact on Kornec's and Nappo's business-property operations of the reclamation project on the Mike Horse Mine operation.   From the meeting it became clear that denial of unrestricted access was the order of the day for the Forest Service and Montana DEQ.

44.    From the time the reclamation project commenced and was put into the oversight of the Montana Department of Environmental Quality, Kornec and Nappo were concerned about the impact of the reclamation and the involved trucking out of the site of material that must at least be highly toxic according to the allegations in the Mike Horse Lawsuit brought by the State.

45.     At the August 2014 meeting, Kornec and Nappo were advised that travel restrictions would have to be put in place because of the truck traffic that would be coming and going on the road giving access to Kornec's and Nappo's mining property interests.  Kornec and Nappo were told that they would have to request permission to travel on their only access road for ingress and egress to their property mining claims.  The request would have to be in writing and presented to the Montana DEQ.  Any travel on the access road not previously scheduled would also need to be confirmed verbally.  The main access road off the highway was a Revised Statute (hereinafter "RS") 2477, having been constructed and used for decades prior to 1976 when RS 2477 was repealed. The United States Supreme Court has held that such RS 2477 rights of way vested in the public and were neither affected by nor abandoned by the repeal.  The road was considered a county road and was maintained by Lewis and Clark County.

46.     The restrictions placed by the Forest Service and DEQ constituted an interference with the operation of the mining claims in the form of an unlawful and unconstitutional blocking of the access road.  Access is guaranteed by the Mining Laws of the United States of America and specifically by RS 2477 under which rights of ways were granted to miners and members of the public.

47.     In 2014, prior to his birthday, Kornec sent to the Forest Service a facsimile message requesting a previously unscheduled travel over the now blocked road on a Saturday for his family to visit and hold a birthday party for his 80th birthday.  He also made a telephone call for the same purpose.  Amber Dawn Kamps, District Ranger for the Lincoln Ranger Station, denied the request on the basis that the Forest Service "could not assume liability for anyone passing through the construction zone."  So, the birthday party for Kornec was not held.

48.     Sometime after this event, Lewis and Clark County turned over maintenance of the road to the Forest Service.

49.     This act was unconstitutional, and it caused immense harm and injury to the Kornec, Nappo, and Intermountain operation.  The road was not only a mine access road over which neither the Lewis and Clark County nor the Forest Service had authority to close; it was also an RS 2477 roadway established well before 1976 (when RS 2477 was repealed) and as such the County did not own the right of way. The County only managed the right of way; the right of way was owned by all the people of the County and could not be closed or granted away by the County except by eminent domain.   The Forest Service was complicit in the County's unconstitutional interference with the Kornec and Nappo operation, and made use of that interference to continue blocking access to the mining site.

24

50.    The interference and blocking of the road continues as of the time of filing this Counterclaim.

51.    But, Kornec was allowed to have guests at his home on the site for his 2015 81st birthday.  He was told by friends that they and others had called the Governor's office, the offices of Representatives and Senators, state and federal, and protested the closing of a public road that prevented celebrating his 80th birthday.  The guests had to arrive at a given time so that they could be loaded into vehicles to be transported in to the site of Kornec and Nappo's mines and mining claims where Kornec makes his home.

52.    One of the other Forest Service acts of harassment and interference came in the form of a complaint about the presence of a powder magazine designed for safe storage of dynamite to be used in the mining operation.  The Bureau of Alcohol, Tobacco, Firearms and Explosives (hereinafter "ATFE") had approved use of this particular powder magazine, and Kornec and Nappo put the magazine where the Forest Service suggested: at the sawmill junction of road to the Kornec original homestead.  Later, the Forest Service demanded moving the powder magazine from the spot it had suggested because of its closeness to a road. Kornec and Nappo, in a spirit of cooperation moved the magazine even though its

site had been approved by both ATFE (which has primary jurisdiction) and Forest Service.

53.     Karen O'Donnell (hereinafter "O'Donnell"), of ATFE, visited the site to observe the new placement of the magazine and because the Forest Service had objected to use of the magazine to store dynamite.  O'Donnell confirmed to Kornec and Nappo that the magazine was secure and safe for storage of dynamite.  She then went to the Lincoln office of the Forest Service to report on the safety and security of the magazine and to report that it was in compliance with ATFE's requirements and those of the law.

54.     After her meeting, O'Donnell called the miners and reported that she was told by the Forest Service that they were "squatters" on an invalid mining claim, that they were breaking the mining laws, and had not worked the claim for five years.  Luke Shimer, appearing as an employee of the Forest Service, was identified as the person who made these assertions.

55.     But for O'Donnell's personal knowledge of the facts, the assertions of the Forest Service would have interfered with the business relationship between Kornec, Nappo, and Intermountain and the ATFE which is an agency critical to them.   Forest Service personnel certainly intended their assertions to cast aspersions on the property interest ownership and validity of mining claims held by

Kornec and Nappo.  No other purpose would be reasonable for such assertions to be made by an employee of the United States' government.

56.    Kornec and Nappo called BLM to report the harassment and interference on the part of the Forest Service.  They talked with an employee whose name was given as "Tesaro."  She told them that she would make some telephone calls to the Forest Service to resolve the issues.  BLM is the overall governing agency of mining claims, since such supervision is given by Congress to the Secretary of Interior who in turn directed it to the BLM under his supervision.

57.    Later, Tesaro called and reported to Kornec and Nappo that she had spoken to Luke Shimer of the Forest Service who told her "Phil is a liar" referring to Nappo.  Tesaro told Nappo that he was a liar and not to bother her again.  This is further evidence of the interference with and harassment of Kornec and Nappo by the Forest Service, trying to bring discredit to Kornec and Nappo with the supervising agency of mining claims.

58.    The Forest Service personnel had also said that the powder magazine was under supervision of non-licensed persons and was used to store materials for an outsider not connected with the mining operation.  Such was not only false and untrue, but showed a negligent failure to check official records of ATFE or a deliberate refusal to acknowledge those records.   Kornec and Nappo both have

ATFE licenses which have an expiration date of 2018.  And, the so-called "outsider" was and is Billy O'Neill, an expert in explosives who consults with and for Kornec and Nappo and has the license from ATFE as the responsible person for the magazine on the site.  He oversees Kornec and Nappo even though they are licensed also.  So, the Forest Service complaint was spurious at best.

59.    A meeting to discuss the interference and harassment by the Forest Service was scheduled for Kornec and Nappo to be held in the Lincoln office of the Forest Service.  Nappo could not attend because of a doctor's appointment, so Todd Fisher, a family friend, accompanied Kornec to the meeting.  They sat and waited for over an hour, as the secretary continued to tell them that the Forest Service personnel were tied up.  Finally, Kornec and Fisher left without having a meeting.

60.    On the day after the scheduled meeting at which the Forest Service personnel did not appear, Kornec and Nappo learned from Shelly, the supervisor of the DEQ cleanup of Mike Horse, that she had escorted to the mine on the previous day the Forest Service personnel who were supposed to meet with Kornec.  While Kornec and Fisher were left sitting, and not being advised there would be no meeting, the Forest Service personnel deviously made a trip to the mining site without knowledge of Kornec and Nappo.

61.     It is clear from the circumstances that the Forest Service lured Kornec and Nappo away from the site to a fictitious meeting in Lincoln, so that they could visit the site without the presence and without permission of any kind from Kornec and Nappo.   This act constituted trespass, intentional trespass, and an unconscionable harassment and interference with Kornec's and Nappo's property interests and rights.

62.     One of the incidents of harassment came in the form of a notice of non-compliance because of cutting live trees in the forest.  Kornec and Nappo had to go through several meetings to convince the Forest Service personnel that they had cut dead trees for wood for the mining operation and for firewood to heat the buildings.  Finally, the Forest Service decided that the matter could be settled by the two paying for firewood for the wood that would be burned for heat in the buildings.  What could have been a simple matter taken care of in a simple visit of one Forest Service person to the site became a complex matter requiring meetings, some of them very contentious.  What the Forest Service faces as simple many times in the course of a firewood season, it treated as a major deficiency on the part of Kornec and Nappo.

63.     In August 2014, the Forest Service cited three deficiencies that needed to be corrected before Kornec and Nappo would be in compliance with Forest

Service rules.  Even though knowing and understanding that they have property rights and ownership of the mining claims, Kornec and Nappo continued trying to get along with the Forest Service, even though BLM had never found fault with the operation.   A meeting was scheduled for discussion of the non-compliance. Included in the meeting were George Littlefield, Luke Shimer (who had called Nappo a "liar" and Kornec and Nappo "squatters" to ATFE), Mike Seawall, Mike Stansburry, two other unidentified Forest Service employees, Kornec, Nappo, and Kornec's and Nappo's adviser Eric Dryden.  Several matters such as cutting a dead tree for firewood necessary to the mining operation, the status of the newer building on the site, and erosion were discussed.  Dryden discussed the need to discuss BLM statutory authority to visit the mine for validation of claims relative to ownership prior to 1955.  Nothing was resolved at this meeting, and to Dryden, Kornec and Nappo, it appeared that the Forest Service had no intention of conducting a meaningful discussion or of resolving the issues raised by the Forest Service.

64.    When the lawsuit was filed against Kornec and Nappo by the United States, the Forest Service relies on the asserted 1986 abandonment, which was never acted on by BLM to stop Kornec and Nappo from proceeding as they had, and as they had the right to do, under the vested interest that was theirs from the

time their claims were filed and recorded, and proved up by location, and then by

working and production.  30 U.S.C. §§ 21-26.

65.    Kornec and Nappo received notice that they had abandoned their

claims clear back in 1986.  This notice is another example of unconstitutional,

unlawful harassment and interference with the peaceful enjoyment of property

rights and interests by Kornec and Nappo.  From the time of the so called

abandonment notice in 1986, the Forest Service knew and lived with the fact that

they knew that Kornec and Nappo claimed a property right in the mining claims and

claimed exclusive rights under 30 U.S.C. § 26.

### Count 1:  Injunctive Relief

66.    Defendants and Counterclaim Plaintiffs allege and re-allege all

allegations in paragraphs 1 through 65 as though fully set forth again.

67.    Kornec and Nappo have been injured by the unlawful harassment and

interference created by the Forest Service as set forth in the prior paragraphs.  They

have been unable to earn income from mining operations for the past two years

because of Forest Service actions and orders not to work without an operation plan.

68.    Kornec and Nappo will be irreparably harmed in that they will lose not

only their current mining operations but all business expectations for products

from the mining claims.  They have no plain, speedy or adequate remedy at law,

because even if they are to win a Declaratory Judgment of their rights and other claims made by counterclaim herein, there will be no guarantee without injunctive relief that the Forest Service will comply, or that the Forest Service will not take endless appeals that will hold Kornec and Nappo in limbo as to revenue and income from their mining operations.

69.     Kornec and Nappo's claim is ripe because if not enjoined by this Court the Forest Service will continue to block access to and egress from the mining claims, continue to harass and interfere with their operations and their property rights and interests.  Kornec and Nappo have reason to believe this because the Forest Service does not comply with the Mining Laws and the Constitutions now, so there is no reason to believe they would follow a decision by this Court based on the laws they are now ignoring.

70.     So long as the Forest Service is allowed to continue violating the rights of Kornec and Nappo, the policy of the United States Government, of which the Forest Service is simply an agent is being thwarted.  Congress has expressed that policy in 30 U.S.C. § 21a:  "The Congress declares that it is the continuing policy of the Federal Government in the national interest to foster and encourage private enterprise in (1) the development of economically sound and stable domestic mining, minerals, metal and mineral reclamation industries, (2) the orderly and

economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help assure satisfaction of industrial, security and environmental needs, (3) mining, mineral, and metallurgical research, including the use and recycling of scrap to promote the wise and efficient use of our natural and reclaimable mineral resources, and (4) the study and development of methods for the disposal, control, and reclamation of mineral waste products, and the reclamation of mined land, so as to lessen any adverse impact of mineral extraction and processing upon the physical environment that may result from mining or mineral activities.  For the purpose of this section "minerals" shall include all minerals and mineral fuels including oil, gas, coal, oil shale and uranium.  It shall be the responsibility of the Secretary of the Interior to carry out this policy when exercising his authority under such programs as may be authorized by law other than this section."

71.     Accordingly, injunctive relief is appropriate to insure that the policy of Congress is carried out by the Forest Service.

## Count 2:  Declaratory Judgment

72.     Defendants and Counterclaim Plaintiffs allege and re-allege all allegations in paragraphs 1 through 71 as though fully set forth again.

73.    The Mining Laws cited above provide to Kornec and Nappo the exclusive right to access to and operation of their mining claim site.  30 U.S.C. § 26 provides:  "The locators of all mining locations made on any mineral vein, lode, or ledge, situated on the public domain, their heirs and assigns, where no adverse claim existed on the 10th day of May 1872 so long as they comply with the laws of the United States, and with State, territorial, and local regulations not in conflict with the laws of the United States governing their possessory title, shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extended downward vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side lines of such surface locations."

74.    As set forth above, the Congress has never changed its policy of encouraging the private sector to mine.

75.    The Forest Service has shown by actions and words that it has no intention of allowing Kornec and Nappo to peacefully and exclusively enjoy their ownership of the mining claims at issue, and to enjoy the benefits of revenue from their mining operations that Congress foresaw for private industry and enterprise.

76.     Only by this Court issuing a Declaratory Judgment setting forth clearly and finally the rights of Kornec and Nappo under the Federal Mining Laws (30 U.S.C. §§ 21-26) can they enjoy their property rights as guaranteed by the Montana Declaration of Rights and the Fifth and Fourteenth Amendments to the United States Constitution.

## JURY DEMAND

In accordance with Rules 38 and 39 of the Federal Rules of Civil Procedure, Defendants-Counterclaim Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Defendants-Counterclaim Plaintiffs pray for judgment from this Court as follows:

1.     The Court deny the Forest Service's claims for injunctive and declaratory relief;

2.     A Declaratory Judgment under 28 U.S.C. §§ 2201(a) and 2202 determining and declaring that Kornec, Nappo, and Intermountain have property rights and interests in their mining claims consistent with 30 U.S.C. §§ 21-26, and that under those provisions they are not subject to the regulatory regime applied by the Forest Service to claims not subject to 30 U.S.C. §§ 21-26;

3.     A Declaratory Judgment under 28 U.S.C. §§ 2201(a) and 2202 that the Forest Service's insistence on applying and having Kornec, Nappo, and Intermountain comply with their post-1955 regulatory regime, under the Multiple Use Mining Act which was passed in 1985, did not and does not retroactively apply to already existing property rights and interests established under 30 U.S.C. §§ 21-26;

4.     An award to Kornec, Nappo, and Intermountain of reasonable attorney fees and expert fees required to bring and maintain this action, pursuant to 30 U.S.C. § 1270, 28 U.S.C. § 2412, and/or such other statute as may be appropriate;

5.     An award to Kornec, Nappo, and Intermountain of costs of suit pursuant to Federal Rules of Civil Procedure 54(d);

6.     An award to Kornec, Nappo, and Intermountain of any other relief that the Court deems just and proper under the circumstances of this case, including but not limited to injunctive relief as requested.

DATED October 1, 2015.

JARDINE, STEPHENSON, BLEWETT & WEAVER, P.C.

By:     /s/ Joshua I. Campbell
Attorneys for Defendants George Kornec, Philip Nappo, and Intermountain Mining and Refining, LLC

**CERTIFICATE OF SERVICE**

I hereby certify that on October 1, 2015, a copy of the foregoing document was served on the following persons by the following means:

1, 2___CM/ECF
_____Hand Delivery
_____Mail
_____Overnight Delivery Service
_____Fax
_____ E-Mail

/s/ Joshua I. Campbell_____

1.    Clerk, U.S. District Court

2.    Michael W. Cotter
      Victoria L. Francis
      U.S. Attorney's Office
      2601 Second Ave. North, Suite 3200
      Billings, MT  59101