IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

HELENA DIVISION

**FILED**

2/21/2019

Clerk, U.S. District Court
District of Montana
Helena Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | CV 15-78-H-CCL |
| Plaintiff, | |
| vs. | OPINION & ORDER |
| GEORGE KORNEC, PHILIP NAPPO, INTERMOUNTAIN MINING AND REFINING, LLC, | |
| Defendant. | |

Before the Court are the parties' cross-motions for summary judgment. Having reviewed the briefs and the record and no party having requested oral argument, the Court is prepared to rule.

**BACKGROUND**

Plaintiff United States seeks a declaration that the Defendants in this case are illegally and unlawfully interfering with the property of the United States by

their failure to comply with the applicable regulations governing the surface land of certain unpatented mining claims known at the White Hope, Sammy K, and Silver Dollar mining claims (collectively the White Hope mining claims). Absent a Plan of Operation that has been approved by the U.S. Forest Service, the United States further seeks an injunction requiring Defendants to remove an unauthorized structure, remove unauthorized explosives stored at the site, and to cease and desist interfering with public and Forest Service access to the unpatented mining claims on public land, including removing of signage and locks, and to cease threatening members of the public and government employees and contractors with criminal trespass. The United States also asks the Court to award it damages in the amount of its costs incurred for restoring or rehabilitating the surface property of the White Hope mining claims, should Defendants fail to cure their noncompliance by a date certain.

In their Counterclaim, Defendants seek a declaratory judgment declaring that they have property rights in the White Hope, Sammy K and Silver Dollar mining claims under the Mining Laws of the United States, 30 U.S.C. § 2, the United States Constitution, and the Montana Constitution. Defendants seek an injunction to prevent the Forest Service from interfering with or damaging their property rights.

## FACTUAL STATEMENT

In 1924, Walt O'Connor located the White Hope Group of unpatented mining claims. His brother-in-law, Sam Kornec, began working with him on the claims in 1928 and the claims were eventually passed to White Hope Mine, Inc. George Kornec was the Secretary Treasurer of White Hope Mine, Inc. (Doc. 59 at ¶ 1). White Hope Mine, Inc. abandoned its mining claims in 1986 by failing to submit the necessary paperwork in an envelope postmarked on or before December 30 of the previous year. (Doc. 59 at ¶¶ 4 - 6). White Hope Mine, Inc., did not appeal the abandonment decision, which was made by the Department of Interior, Bureau of Land Management (BLM), instead refiling on 36 of the claims. (Doc. 59 at ¶¶ 10 - 11) .

White Hope Mine Inc. transferred its mining claims to Intermountain Mining & Refining, LLC (Intermountain) on October 8, 2010. (Doc. 59 at ¶ 3). As of August 31, 2015, Intermountain had ten active unpatented mining claims with BLM relevant to this suit: Sammy K, Silver Dollar and White Hope 1 through 8. (Doc. 59 at ¶ 12).

At the end of February 2012, George Kornec, on behalf of Intermountain, submitted a proposed Plan of Operations for exploration of the White Home/Sammy K and Silver Dollar mining claims. (Doc. 59 at ¶ 60). District

Ranger Kamps signed the Plan of Operations on March 12, 2012. (Doc. 59 at ¶ 62).

The duration of the operation contemplated by the 2012 plan was less than two years, through 2014. (Admin. Rec. at 591). There was nothing included under the "Access" portion of the 2012 plan. (Admin. Rec. at 592 - 593). The project description in the 2012 plan states: "Cutting of bug killed trees around buildings to prevent damage. Will have Forest Service personnel review before we start this removal. Larger trees will be used for retimbering the mine, small trees and material from the prep for the timbers will be purchased with a firewood permit for the crews quarters and office. Sample materials will prossecced [sic] using a wave table as long as water is available." (Admin. Rec. at 594). The only structures described in the 2012 plan were office and crew quarters, compressor house, storage and sample concentrator building and a travel trailer. (Admin. Rec. at 594). The only explosives referenced in the 2012 plan were one box of dynamite, one sack of nitrate and two boxes of blasting caps. (Admin. Rec. at 596).

In August of 2013, District Ranger Kamps received complaints that members of the public were being told that they could not trespass or hunt on George Kornec's claim. (Admin. Rec. at 1306). Forest Service personnel

conducted a site visit on August 13, 2013, and noted that "no trespassing" signs were placed on a post behind the gate, which constituted an unauthorized activity. (Admin. Rec. at 1759).  Phil Nappo and George Kornec were both present during the site visit and, after some discussion, agreed to remove the signs.  (Admin. Rec. at 1761).  In April of 2014, Forest Service personnel conducted two onsite inspections, both of which revealed unauthorized activities.  (Doc. 59 at ¶¶ 69 - 70).

On June 6, 2014, George Kornec submitted a new proposed Plan of Operations.  (Doc. 59 at ¶ 71).  The type of operation was described as "development and mining" (Admin. Rec. at 637)  in addition to lode exploration, which was the type of operation listed on previous proposed plans.  (*See e.g.* Admin. Rec. at 591).  The duration of the operation contemplated by the 2014 proposed plan was a minimum of two years.  (Admin. Rec. at 637).  The 2014 proposed plan included extensive information in the "Access" portion, stating in part:

> A Forest Road ends at a currently locked gate at the point where the road intersects the Operator's mining claims.  An unnumbered road which is shown in the Helena National Forest's travel plan, but the legal status of which is uncertain, runs from the gate to the mine buildings shown on the map. . . . The road has in the past been gated and locked at a point before entering onto the

Operator's claims to prevent vehicle access through this active mining operation, in response to past acts of vandalism and to safeguard the Operator's property interests and personnel safety, to protect the public and protect the Operator from potential liability for injuries to the public, given the use of mechanical equipment in the conduct of the mining operations. . . . With the road gate closed and locked, members of the public can pass through the Operator's claim on foot, and this has proved to be a workable compromise in terms of providing access through the property. Removing the lock and opening the gate would create an unreasonable burden to the Operator, and on its principal George Kornec, as the Operator exercises its statutory and regulatory rights as a claimant under applicable federal land and mining law, as implemented by the courts and federal agencies. To enhance security while still providing for foot access through the Operation, Operator will post signs instruct [sic] hikers to say [sic] on the road as it passes through the operation, in the following terms: "Active Mining Operation. Stay on Road." Existing road on the mining claims which branch off the Forest Road may be closed with a chain and posts and marked with a sign saying "Active Mining Operation Stay Out." The agency will mark the Forest Road at appropriate locations withing [sic] the mining claims with Forest Road number signs.

(Admin. Rec. at 639). The project description in the 2014 proposed plan states:

The project is an underground mining operation using blasting and mechanical means to mine ore and, as necessary for ore removal, barren rock. Ore will be removed from underground workings, stored on the surface, pending milling, concentration and/or transportation off site. At present the processing operations on site consist of crushing the ore and concentrating it by means of a wave table. Barren

6

> rock will not be removed from underground workings
> or will be replaced in underground workings and not
> stored on the surface. Dead trees on site will be cut
> and utilized from time to time for mine timbering.
> Small trees and material from the prep for the timbers
> will be used as firewood for the crews quarters and
> office.

(Admin. Rec. at 640). The "Structures" section of the 2014 proposed plan

included a reference to a "12 x 20 single vehicle garage" along with office and

crew quarters, compressor house, storage and sample concentrator building listed

on the approved 2012 plan. (Admin. Rec. at 640). The "Hazardous Substances"

section of the proposed 2014 plan included the following reference to explosives:

"Explosives use on site is minimal as blasting is used only to supplement electric

rock drills. Blasting powder will be stored in an ATF-approved magazine located

as indicated on the attached map." (Admin. Rec. at 642).

The Court has compared the Plan of Operations submitted in February and

approved in March of 2012 (Admin. Rec. at 591 - 598) and the Plan of Operations

proposed in June of 2014 (Admin. Rec. at 637 - 644). This comparison reveals

that the operation contemplated by the 2014 plan is far more extensive than the

operation contemplated by the 2012 plan. The plan approved in 2012, like plans

proposed before it, primarily involved exploration with minimal site disturbance.

The operation contemplated by the 2014 plan involved underground mining using

blasting and mechanical means with ore to be stored on the surface and processed on-site.

Amberdawn Kamps, who was then the District Ranger for the Lincoln Ranger District of the Helena National Forest, sent Mr. Kornec and Mr. Nappo a letter on July 9, 2014, explaining that her staff needed more than 30 days to review their proposed plan and warning that the proposed plan would likely require a new NEPA analysis. In her letter, District Ranger Kamps also referenced the unauthorized structure erected after the October 2013 inspection and noticed by her staff during their April 7, 2014, site visit. She warned Mr. Kornec and Mr. Nappo that "activities on your unpatented mining claims must remain in compliance with your existing POO and our regulations until the new POO is approved." (Admin. Rec. at 1001).

On August 19, 2014, the Forest Service issued a Notice of Noncompliance to George Kornec and Phil Nappo and Intermountain. (Doc. 59 at ¶ 80). Intermountain and its members, George Kornec and Phil Nappo, (collectively Intermountain) appealed the first two elements of the Notice of Noncompliance: (1) the construction of the garage building without authorization under an approved plan of operation; and (2) the cutting of trees on the White Hope and Silver Dollar mining claims without authorization under an approved plan of

operation. (Admin. Rec. at 1941). Intermountain requested oral presentation. (Admin. Rec. at 1946). The request was granted and the oral presentation was held on November 6, 2014. (Admin. Rec. at 2096).

Although Intermountain appealed the decision that the firewood was cut without authorization, it agreed to pay for four cords of cut firewood. (Admin. Rec. at 2084). Rather than denying that the garage structure was constructed without authorization, Intermountain argued that the building was not "unreasonably causing injury, loss or damage to surface resources" and "should be allowed to remain on site until the Forest Service has completed its review of Intermountain's proposed plan of operations." (Admin. Rec. at 2081).

The Forest Supervisor issued his decision on December 3, 2014, holding that the District Ranger's decision was "reasoned" and "complied with all the laws, regulations, and policy." (Admin. Rec. at 2096). The Forest Supervisor affirmed the District Ranger's decision to have the unauthorized garage removed from the National Forest and instructed that the site of the unauthorized garage building be reclaimed after the structure was removed. The Forest Supervisor extended the date for removal through June 30, 2015, since the date that the District Ranger instructed the structure be removed had passed. (Admin. Rec. at 2096).

9

The Forest Supervisor affirmed the District Ranger's decision to bill Intermountain for the wood that was cut, but reduced the number of cords to four, based on Intermountain's modified request for relief, made at the oral presentation. (Admin. Rec. at 2097). The Forest Supervisor instructed that the four cords be cut to lengths of six feet or less within 14 days of receipt of the decision, remain on the claim, and not be sold. (Admin. Rec. at 2097).

In early February 2015, George Kornec submitted a proposed Plan of Operations on behalf of Intermountain. (Doc. 59 at ¶ 98). The duration of the operation contemplated by the 2015 proposed plan was ten years. (Admin. Rec. at 650). The 2015 proposed plan includes extensive information in the "Access" portion, which is substantially the same as the information in the "Access" section of the proposed 2014 plan. (Admin. Rec. at 651). The project description in the 2015 proposed plan is also substantially the same as that found in the 2014 proposed plan. (Admin. Rec. at 653). The "Structures" section of the 2015 proposed plan included a reference to a "12x20 Storage garage" (Admin. Rec. at 653) – the same unauthorized garage that was to be removed by June 30, 2015, according to the Forest Supervisor's order. (Admin. Rec. at 2096).

Within one month of receiving the 2015 proposed plan, the Forest Service sent Mr. Kornec a letter explaining that the Minerals Staff was reviewing the

proposed plan. (Doc. 59 at ¶ 103). Forest Service personnel met with Mr. Kornec and Mr. Nappo in June and July of 2015 to discuss the proposed plan. (Doc. 59 at ¶ 107).

In early August of 2015, Mr. Kornec and Mr. Nappo sent a letter to the Lincoln Ranger District revoking "all prior signatures affixed to any and all plans of operation submitted on behalf of George Kornec, Phil Nappo, White Hope Mine, Inc., and Intermountain Mining and Refining." (Admin. Rec. at 1059). The letter was dated August 3, 2015 and the envelope was postmarked August 5, 2015. (Admin. Rec. at 1060). Mr. Kornec and Mr. Nappo signed another letter dated August 3, 2015, and addressed to Helena National Forest Supervisor Office and Lincoln Ranger District notifying the United States Forest Service, its employees, contractors and agents that they must coordinate future entry onto the White Hope Mining Claim with the claim owners or risk arrest for trespassing under Montana law. (Admin. Rec. at 1061).

On August 31, 2015, Mr. Kornec, on behalf of Intermountain, submitted a proposed Plan of Operations substantially similar to the plan proposed in February of that year. (Admin. Rec. at 709). The expected duration of the project was reduced from ten to five years. (*Cf.* Admin. Rec. at 650 and 709). A reference to ATF jurisdiction over possession of and security of explosives was added to

Section IV, D (Admin. Rec. at 712) and Section V, G. (Admin. Rec. at 714). A reference to approval by ATF and the Lewis and Clark County Sheriff was also added to Section V, G. (Admin. Rec. at 712). Additional positive information about water quality was added to Section V, B, (Admin. Rec. at 713), a notation that reclamation of the area at White Hope #7 had improved the scenic value of that area was added to Section V, D, (Admin. Rec. at 713), and reference to the historical importance of mining was added to Section V, F, the "Cultural Resources" section. (Admin. Rec. at 714). It does not appear that the Forest Service responded to the August 2015 proposed plan.

On November 9, 2016, Phil Nappo submitted a proposed Plan of Operations on behalf of Intermountain, which was substantially similar to the August 30, 2015, proposed plan. (Supp. Admin. Rec. at 2375 - 2383). The expected duration of the project was only one year. (Supp. Admin. Rec. at 2375). Although changes were made to the access section, the proposed plan contemplates a double lock on the gate into the mining claim site limiting entry to the mining site operator and Forest Service personnel and blocking public access. (Supp. Admin. Rec. at 2376). The "Structures" section continues to reference the 12 x 20 storage garage, (Supp. Admin. Rec. at 2378), which was to have been removed by June 30, 2015.

The Forest Supervisor acknowledged receipt of the November 9, 2016,

proposed plan on December 9, 2016.  (Supp. Admin. Rec. at 2384).  On January 30, 2017, the Forest Service responded to the November 9, 2016, proposed plan with its completeness review.  (Supp. Admin. Rec. at 2440 - 2446).  The Forest Services's seven-page letter included detailed requests for additional information.  (Supp. Admin. Rec. at 2440 - 2446).  The letter was sent certified mail, return receipt requested on February 7, 2017, and was returned unclaimed on February 23, 2017.  (Supp. Admin. Rec. at 2447).

## LEGAL STANDARD

The Court previously determined that the appropriate standard of review is the deferential "arbitrary and capricious" standard provided by the Administrative Procedures Act, 5 U.S.C. § 706, which also provides the necessary waiver of sovereign immunity for equitable relief.  (Doc. 30).  "'[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.'"  *Florida Power & Light v. Lorion*, 470 U.S. 729, 744 (1985) (quoting *Camp v. Pitt*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973)).  With a few exceptions not shown to be present in this case, the Court's review is limited to the administrative record.  5 U.S.C. § 706.  The factual statement provided above is therefore drawn from the Administrative Record and Supplemental Administrative Record provided by the

13

United States. The Court has paid particular attention to those portions of the record cited by Defendants in their Statement of Undisputed Facts (Supplemental). (Doc. 61).

Because the Court is conducting a review under the administrative procedures act, it "will reverse the agency action only if the action is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law." *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th Cir. 2009) (citing 5 U.S.C. § 706(2)).

The United States also seeks summary judgment as to its request for declaratory relief and injunctive relief, which goes beyond the final determinations made in the administrative proceeding. The United States asks the Court to order removal of unauthorized explosives stored on Defendants' unpatented mining claims. (Doc. 1 at 14, ¶ 2). The United States also asks the Court to restrain "Defendants and all persons acting in concert or participation with Defendants from interfering with public, or Forest Service access, to the White Hope mining claims" and to order Defendants to remove locks and signage. (Doc. 1 at 14, ¶ 3).

Defendants also seek summary judgment on their counterclaims for a declaratory judgment declaring that they have property rights in the White Hope, Sammy K and Silver Dollar mining claims and an injunction preventing the Forest Service from interfering with or damaging their property rights.

14

Fed.R.Civ.P. 56(a) permits a party to seek summary judgment "identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Summary judgment or adjudication is appropriate when the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assn.,* 809 F.2d 626, 630 (9th Cir.1987).

Both parties have overcome the first hurdle to obtaining summary judgment, as they agree that there are no disputed issues of material fact. The Court must therefore decide the legal issues raised by the cross-motions for summary judgment.

## DISCUSSION

The first issue that must be addressed in deciding this case is whether Defendants' unpatented mining claims are subject to regulation by the United States Forest Service. Defendants argue that their mining claims are exempt from restraints imposed by federal laws enacted after their claims were staked by their predecessors in interest.

The general mining law of the United States was first established "in skeletal form in 1866, and in substantially its current form in the Mining Law of

1872." *United States v. Shumway*, 199 F.3d 1093, 1098 (9th Cir. 1999). The

Mining Law of 1872, codified at 30 U.S.C. § 22 *et seq.,* allows "United States

citizens to go onto unappropriated, unreserved public land to prospect for and

develop certain minerals. 'Discovery' of a mineral deposit, followed by the

minimal procedures required to formally 'locate' the deposit, gives an individual

the right of exclusive possession of the land for mining purposes." *United States

v. Locke*, 471 U.S. 84, 86 (1985). "This right was limited by the Surface

Resources and Multiple Use Act of 1955, which reserved to the United States the

right to manage and dispose of surface resources on unpatented mining claims;"

provided that the surface use does not interfere with the mining operation. *United

States v. Doremus*, 888 F.,2d 630, 632 (9th Cir. 1989).

The claims at issue here were originally located by Walt O'Connor in 1924

and eventually passed to White Hope Mine Inc. While the claims located in 1924

were not subject to the Surface Resources and Multiple Use Act of 1955, White

Hope Mine, Inc. forfeited those claims in 1986 by failing to follow the procedures

established in 1976 by the Federal Land Policy and Management Act (FLPMA).

Congress enacted FLPMA in response to the "virtual chaos" created on

public lands by the existence of more than six million unpatented and unrecorded

mining claims with no system in place to allow public land managers to identify

16

those claims. *Locke*, 471 U.S. at 86 - 87. FLPMA "establishes a federal recording system that is designed both to rid federal lands of stale mining claims and to provide federal land managers with up-to-date information that allows them to make informed land management decisions." *Id*. at 87.

FLPMA imposed two general requirements on claims located prior to its enactment. The first, which is not at issue here, required initial registration of the claims with the BLM. The second requires claimants to file with the appropriate state official and the BLM "in the year of the initial recording, and 'prior to December 31' of every year after that . . . a notice of intention to hold the claim, an affidavit of assessment work performed on the claim, or a detailed reporting form." *Locke*, 471 U.S. at 87 - 89.

Although George Kornec signed his affidavit on December 30, 1985, (Admin. Rec. at 2264) he did not send it to the BLM until December 31, 1985, as evidenced by the December 31, 1985, postmark. (Admin. Rec. at 2266). The annual filing requirement established by FLPMA states that documents are to be filed "prior to December 31 of each year," 43 U.S.C. § 1744(a) and provides that failure to timely file the required documents "shall be deemed conclusively to constitute an abandonment of the mining claim . . ." 43 U.S.C. § 1744(c).

The United States Supreme Court has considered and rejected the argument that documentation submitted by a claimant on December 31 meets the requirement that documents are to be filed annually "prior to December 31," *Locke*, 471 U.S. at 95, and the argument that submission on December 31 could constitute substantial compliance with the filing deadline. *Id.* at 100.   Failure to submit the claim prior to December 31 results in loss of the claim, regardless of the reason for failure to meet the deadline because "the failure to file on time, in and of itself, causes a claim to be lost." *Id.*

The United States Supreme Court also upheld the constitutionality of the retroactive application of FLPMA to claims located before its enactment in *Locke*. *Id.* at 106 - 107.  The Court also held that FLPMA's extinguishment of a claim for failure to meet the annual filing requirement does not constitute a "taking" in violation of the 5th Amendment to the United States Constitution because it is the claimant's failure to file on time that causes the right to be extinguished. *Id.* at 107.  The Court also held that FLPMA does not violate the due process rights of individuals and entities that located their claims prior to its enactment.  Claimants had three years in which to meet the statute's recording requirement and "the specific annual filing obligation at issue" in both *Locke* and this case "is not triggered until the year after which the claim is recorded initially. . ." *Id.* at 108.

Mr. Kornec registered the claims at issue in 1979, (Admin. Rec. at 2261), and appears to have met his filing obligations on those claims in 1980 (Admin. Rec. at 2286), in 1981 (Admin. Rec. at 2283), in 1983 (Admin. Rec. at 2274) and in 1984 (Admin. Rec. at 2272). Although Mr. Kornec knew what the filing requirements were and demonstrated his ability to meet those requirements in prior years, he failed to do so in 1985, resulting in the loss of his claims. Mr. Kornec admitted in a letter to the BLM dated May 21, 1986, that his 1985 submission had been post-marked a day late. (Admin. Rec. at 2220 - 2221).

Unlike the claimants in *Locke*, Mr. Kornec had the option of refiling his claims. He stated in his May 1986 letter that he had refiled the claims that had been abandoned. (Admin. Rec. at 2220). The Surface Resources and Multiple Use Act of 1955 applies to the claims that were filed by Mr. Kornec in 1986, after the abandonment of his older claims. Those claims, including the claims at issue in this case, are therefore subject to regulation by the United States Forest Service.

The United States also argues that unpatented mining claims located on national forest land before the enactment of the Surface Resources and Multiple Use Act of 1955 are subject to Forest Service regulation based on the Organic Administration Act of 1897 (Organic Administration Act). The Organic Administration Act "established the national forest system" and authorizes the

19

Secretary of Agriculture to promulgate rules and regulations to protect the national forest lands from destruction an depredation." *Clouser v. Espy*, 42 F.3d 1522, 1529 (9th Cir. 1994)(citing 16 U.S.C. § 551). The provision of the Organic Administration Act which allows individuals to enter national forests for "prospecting, locating, and developing the mineral resources thereof" makes it clear that those individuals "must comply with rules and regulations covering such national forests." 16 U.S.C. § 478.

In *Clouser v. Espy*, the United States Court of Appeals for the Ninth Circuit considered the provisions of the Organic Administration Act and engaged in an extensive survey of Ninth Circuit cases involving the Forest Service's regulation of mining claims, holding "there can be no doubt that the Department of Agriculture possesses statutory authority to regulate activities related to mining – even in non-wilderness areas[1] – in order to preserve the national forests." *Clouser*, 42 F.3d at 1530, citing 16 U.S.C. § 551. If Mr. Kornec had not abandoned his pre-1955 claims, those claims would have been subject to regulation by the United States Forest Service based on the provisions of the Organic Administration Act.

---

[1] There were three claims at issue in *Clouser*, two of which were located within designated "wilderness areas," and the Ninth Circuit engaged in a separate analysis in deciding the Forest Service's regulatory authority over the Wilson Claim, which was not located in designated "wilderness areas." *Clouser*, 42 F.3d at 1528. The Wilson Claim is also similar to Defendants' claims because it was located (albeit in-validly) in 1934, *id.* at 1526, before the passage of the Surface Resources and Multiple Use Act of 1955.

Although Defendants have a property interest in their unpatented mining claims, that property interest is limited by both the Organic Administration Act of 1897 and the Surface Resources and Multiple Use Act of 1955.  Defendants are not entitled to the injunctive and declaratory relief sought in their counterclaim.

"One of the clear purposes of the 1955 legislation was to prevent the withdrawal of surface resources from other public use merely by locating a mining claim." *United States v. Curtis-Nevada Mines, Inc.*, 611 F.2d 1277, 1285 (9th Cir. 1980).  As explained above, Defendants abandoned their pre-1955 claims and their current claims are subject to the Surface Resources and Multiple Use Act of 1955. Their property interest in the claims therefore does not extend to excluding members of the public and Forest Service personnel from their mining claims. The government's request for an injunction restraining Defendants from interfering with public and Forest Service access to the unpatented mining claims at issue in this case and ordering Defendants to remove locks and signage will be granted.

Having determined that the Defendants' unpatented mining claims are subject to regulation by the United States Forest Service, the Court must decide whether the Forest Service's decisions relating to Defendants' mining claims in the underlying administrative case were arbitrary and capricious.

1.   <u>Decision regarding tree cutting</u>.

The Lincoln District Ranger determined that Intermountain and its principals, Mr. Kornec and Mr. Nappo, violated Forest Service regulations by cutting trees on the White Hope and Silver Dollar mining claims without authorization under an approved plan of operation.  The Forest Supervisor affirmed the District Ranger's decision.

Forest Service regulations prohibit "[c]utting or otherwise damageing any timber, tree, or other forest product, except as authorised by a special use authorization, timber sale contract, or Federal law or regulation." 36 CFR § 261.6(a).  In its approved 2012 Plan of Operations, Intermountain noted that it planned to cut "bug killed trees around buildings to prevent damage."  The plan also stated that the operators would "have Forest Service personnel review before we start this removal."  Mr. Kornec and Mr. Nappo failed to get permission from Forest Service personnel before removing the trees, thus violating their own plan of operation and the regulation.

Defendants argue that the Forest Service's determination that the tree cutting was unauthorized was arbitrary and capricious because the Forest Service Manual allows cutting of trees on a mining claim for mining uses and for necessary clearing.  The United States Court of Appeals for the Ninth Circuit

rejected a similar argument in *United States v. Doremus*, holding "the Forest Service Manual merely establishes guidelines for the exercise of the Services's prosecutorial discretion, it does not act as a binding limitation on the Services's authority." 888 F.2d at 633, n. 3. The District Ranger and the Forest Service were acting within their authority when they ordered Defendants to pay for the trees that were cut and their decision was not arbitrary and capricious.

    2.    <u>Decision regarding unauthorized structure</u>.

The Lincoln District Ranger determined that Intermountain and its principals, Mr. Kornec and Mr. Nappo, violated Forest Service regulations by constructing a garage building without authorization under an approved plan of operation. The Forest Supervisor affirmed the District Ranger's decision to have the unauthorized garage removed from the National Forest and instructed that the site of the unauthorized garage building be reclaimed after the structure's removal.

Forest Service regulations prohibit "[c]onstructing, placing, or maintaining any kind of road, trail, **structure**, fence, enclosure, communication equipment, significant surface disturbance, or other improvement on Naional Forest System lands or facilities without a special-use authorization, contract, or approved operating plan when such authorization its required." 36 CFR § 261.10(a) (emphasis added). The structure was constructed sometime between the Forest

Service's October 2013 inspection and April 2014 site visit. (Admin. Rec. at 1001). The structure was not referenced in or approved by the 2012 Plan of Operations. (Admin. Rec. at 594). Intermountain did not deny that the structure was built without authorization. (Admin. Rec. at 2081). The building of the unauthorized structure clearly violated the plain language of the regulation and the Forest Supervisor's order for its removal was not arbitrary and capricious.

3.   Removal of explosives.

The United States has moved for summary judgment on all relief requested in its Complaint, which includes a request for removal of unauthorized explosives. Although the issue regarding unauthorized explosives was not raised in the Notice of Noncompliance and the United States has not referred the Court to any specific regulation prohibiting the storage of explosives on National Forest Land, the incendiary nature of explosives and the danger explosives pose to the National Forest is clear.

Before granting the government's request for removal of the explosives, the Court must determine whether the Forest Service authorized the storage of explosives. Defendants correctly point out that the storage of explosives on the White Hope/Sammy K/Silver Dollar claims was authorized by the 2012 approved plan. (Admin. Rec. at 596). Defendants forfeited the benefit of the approved 2012

24

plan in August of 2015, when they sent the Forest Service a letter revoking "all prior signatures affixed to any an all plans of operation submitted on behalf of George Kornec, Phil Nappo, White Hope Mine, Inc., and Intermountain Mining and Refining." (Admin. Rec. at 1059). Defendants currently have no operating plan in place and have not been authorized to store explosives on their mining claims.

## CONCLUSION AND ORDER

As explained above, Defendants are not entitled to the right to exclusive possession of the surface of their unpatented mining claims, which were filed in 1986. Defendants' actions on those claims are subject to regulation by the United States Department of Agriculture, acting through the United States Forest Service, under both the Organic Administration Act of 1897 and the Surface Resources and Multiple Use Act of 1955. The Forest Service's enforcement of its duly promulgated regulations is authorized by law and the Forest Service has not acted arbitrarily or capriciously. Accordingly,

IT IS HEREBY ORDERED that Defendants' motion for summary judgment (Doc. 60) is DENIED and Plaintiff's motion for summary judgment (Doc. 53) is GRANTED.

IT IS FURTHER ORDERED that judgment shall enter declaring Defendants' actions, as described in Plaintiff's Complaint, illegal and a violation of the regulations governing the surface land of the unpatented mining claims at issue in this case.

IT IS FURTHER ORDERED that Defendants shall remove any unauthorized locks, signs, explosives and the structure described on the February 9, 2015, proposed plan of operations as a 12 x 20 storage garage (Admin. Rec. at 653) on or before June 30, 2019.  Should Defendants fail to comply with this order, the United States may enter the mining claim area on or after July 1, 2019, and remove the unauthorized locks, signs, explosives and structure and recover damages from Defendants for the costs incurred for the removal and for restoring and rehabilitating the surface area.

The Clerk of Court is directed to enter judgment in accordance with this order.

Dated this 21st day of February, 2019.

CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE